UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW PERKINS,

      Plaintiff,

v.

DETROIT SALT COMPANY,

      Defendant.

Case No. 20-11211
Honorable Laurie J. Michelson

---

**OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]**
**AND DENYING PLAINTIFF'S MOTION TO STRIKE [21]**

---

Andrew Perkins, who is African American, used to work for Detroit Salt Company. He was responsible for shipping bags of salt. Glenn Lustila and Tom Loeffler, who are Caucasian, were responsible for packaging the salt into bags that Perkins would then ship. According to Perkins, Loeffler, and to a lesser extent, Lustila, made discriminatory remarks about African Americans; on at least one occasion, Loeffler even referred to his African American co-workers as n***s. Perkins reported some of what he had heard to his supervisor, John Shook. Shook investigated Perkins' reports but never logged them or notified human resources or other management about them.

After working at Detroit Salt for over a year, Perkins learned of a possible restructuring that would make Lustila his supervisor; this prompted Perkins to file a complaint with human resources alleging, among other things, racism in the workplace. Perkins' complaint triggered an internal investigation. About a week after

the internal investigator issued her report, Detroit Salt fired Loeffler for using racist language and reprimanded Shook for not reporting allegations of racism to human resources or management. Around the same time, Detroit Salt made an "initial decision" to terminate Perkins' employment. He was let go about three weeks later in what Detroit Salt says was a pre-planned corporate restructuring.

In time, Perkins sued his former employer under federal and state laws prohibiting racial discrimination in the workplace; and in more time, Detroit Salt sought summary judgment on all of Perkins' claims.

As detailed below, a reasonable jury could find that Perkins faced a racially hostile work environment and that, despite being aware of this, Detroit Salt waited too long to remedy it. Further, a reasonable jury could find that had Perkins not complained of the racially hostile environment, he would have continued his employment with Detroit Salt. So Detroit Salt's motion will be denied.

## I.

### A.

Because Detroit Salt seeks summary judgment, when the parties dispute what happened, the Court accepts Perkins' version of the events as true. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

#### 1.

The Detroit Salt Company owns and operates Michigan's only salt mine. The mined salt is used to melt ice on roadways. (ECF No. 18-8, PageID.832.) When the events that led to this case occurred, Detroit Salt's president was Emanuel Manos; peopled called him "EZ." (ECF No. 18-10, PageID.878.)

Detroit Salt is one of several subsidiaries of Kissner U.S.A. Group Holdings (Kissner Holdings). (ECF No. 18-12, PageID.899; *see also* ECF No. 16-4, PageID.254.) Kissner Holdings' Chief Operating Officer was Mitchell Dascher. (ECF No. 16-4, PageID.254.) Manos reported to Dascher. (ECF No. 18-10, PageID.878; ECF No. 16-4, PageID.255.)

In 2017, a bagging plant was erected on Detroit Salt's premises. As the name suggests, the plant put salt from the mine into bags to be shipped and sold. The plant operated from about June of one year to about March of the next, in preparation for and during the winter months. (ECF No. 16-4, PageID.259; ECF No. 16-11, PageID.473; ECF No. 18-2, PageID.738.) It was initially contemplated that Kissner Packaging, another subsidiary of Kissner Holdings, would operate the plant, but Dascher recalls that Manos wanted control over the project; "[s]o it was taken away from Kissner Packaging and given to Detroit Salt to finish and to staff up and organize and run." (ECF No. 16-4, PageID.255.) The bagging plant was staffed with three year-round Detroit Salt employees and about 10 or so seasonal employees who were hired through staffing agencies.

From about June 2017 to about June 2019, Glenn Lustila and Tom Loeffler were two of the three year-round employees. Lustila, who had been working in the mine as an electrician, became the "packaging captain" of the bagging plant. (ECF No. 16-2, PageID.172; ECF No. 16-3, PageID.213.) Loeffler, who had also been working in the mine, became the "production operator" of the bagging plant. (ECF No. 16-2, PageID.172; *see also* ECF No. 16-21, PageID.559.) Loeffler worked for

3

Lustila on the production line, and the two were friends. (ECF No. 16-3, PageID.227; ECF No. 16-5, PageID.286.) Lustila reported to John Shook, Detroit Salt's Vice President of Operations. (ECF No. 18-10, PageID.878.) In his role as the packaging captain, Lustila supervised four or so seasonal workers from a staffing agency. (ECF No. 16-3, PageID.227, 239; *see also* ECF No. 16-5, PageID.281–282, 298; ECF No. 16-21, PageID.559.) According to Lustila, the vast majority, if not all, of these seasonal workers were African American. (ECF No. 16-5, PageID.285.)

The third year-round employee at the bagging plant was Perkins. Perkins was hired in September 2017. (ECF No. 18-13, PageID.905.) Although Perkins' title was "shipping clerk," his duties were broad. (ECF No. 16-7, PageID.339; ECF No. 16-3, PageID.214.) To streamline them a bit, Perkins was responsible for scheduling inbound shipments (supplies) and outbound shipments (bagged salt) and unloading and loading the shipping trucks when they arrived. (ECF No. 16-3, PageID.215–216.) To help with unloading and loading trucks and other tasks, Perkins would hire and supervise seasonal workers. (ECF No. 16-3, PageID.216, 218, 224, 228; ECF No. 16-7, PageID.327, 339.) At various times, four of Perkins' sons worked for Detroit Salt, including Collef Perkins and Tabyis Perkins. (ECF No. 16-7, PageID.311.) Like Lustila, Perkins reported to Shook (the Vice President of Operations). (ECF No. 18-8, PageID.830; ECF No. 18-10, PageID.878.) Shook in turn, reported to Manos (president), and Manos reported to Dascher (Kissner Holdings COO).

Things went well enough for a time. In the bagging plant, Lustila and Loeffler were responsible for bagging the salt; out in the yard, Perkins was responsible for

shipping the bagged salt. (ECF No. 16-5, PageID.285; ECF No. 16-3, PageID.212, 216, 249.) It appears that there were not significant issues during the first salt season, which ended around March 2018.

<div align="center">2.</div>

Fast forward about a year.

In or around February 2019, Dascher had a discussion with Manos about the bagging plant. Dascher recalls, "I . . . probably . . . put[] the thought in EZ Manos's mind that I felt like that [the] packaging plant did not run well. . . . I was not happy with its safety record. It was not efficient. Its costs were high. And I felt like it was . . . a distraction on the important work that the mine had to do." (ECF No. 16-4, PageID.259.) Dascher's reference to "safety record" may relate to three workplace injuries that had occurred around that time. (*See* ECF No. 18-2, PageID.746; ECF No. 18-14, PageID.1010.) According to Dascher, there was discussion about restructuring the bagging plant and having Kissner Packaging take over its operations. (*See* ECF No. 16-4, PageID.259.)

The next month, Shook and Perkins talked about Perkins' role at the bagging plant. In one conversation, Shook told Perkins that there would be an increased emphasis on workplace safety and suggested that Perkins would be taking a lead role in that regard. (ECF No. 16-3, PageID.219, 244–245; ECF No. 16-12, PageID.489, 497.) Later in March, Shook leaked to Perkins that the bagging plant might undergo a restructuring. In particular, Shook indicated that Lustila might take over both the

<div align="center">5</div>

production and shipping side of the bagging operations and that Perkins would report to Lustila. (ECF No. 16-12, PageID.508; ECF No. 16-3, PageID.237.)

The potential restructuring concerned Perkins. So on March 26, 2019, Perkins sent a complaint to Kissner Holdings' human resources department asserting that he, not Lustila, should be promoted. (ECF No. 18-19, PageID.1094.) Perkins wrote, "I was told about a week ago that Glenn [Lustila] would be taking over the entire Bagging Plant with a promotion. And also Tom [Loeffler] will be taking over the Production department with a promotion. Both of these guys have [n]o prior background or experience with Shipping & Receiving, Production or Inventory (which I have experience, knowledge and skills in)." (ECF No. 18-19, PageID.1094.)

In addition to raising the promotion issue, Perkins also asserted that Lustila and Loeffler had harassed him. Perkins' complaint to HR explained that Loeffler had, on multiple occasions, called him names "such as Bitch and Motherfuckers." (ECF No. 18-19, PageID.1094.) Perkins also reported that locks on the gates had been changed, which interfered with his ability to open the gates for truck shipments. (*Id.*) Perkins further claimed that he had been banned from entering his office inside the bagging plant because Loeffler and Lustila were agitated by his presence in his office. (*Id.*)

"Finally," Perkins wrote, "I would like to file a complaint against Glenn [Lustila], Tom [Loeffler] and The Detroit Salt Company for racial discrimination." (ECF No. 18-19, PageID.1094.) Perkins informed HR about a February 2018 comment that Loeffler had made to his son, Tabyis Perkins. In particular, Perkins had heard

6

from Tabyis that Loeffler had yelled at Tabyis, "Run Toby, back to the machine." (*Id.*) Perkins explained to HR, "Toby is a famous name from the slave movie 'Roots.'" (ECF No. 18-19, PageID.1094–1095.) Perkins also told HR about Lustila making racists remarks to his other son, Collef Perkins. Perkins wrote, "[Lustila] walked up to [an] employee and said 'Get off your phone, boy'. The employee responded by saying 'Glenn, you don't have to talk to me like that, I'm a grown man'. Glenn replied 'You not gone tell me what not to do. Now get your ass over [there] and get them pallets boy'." (ECF No. 18-19, PageID.1095.) Perkins also told HR that he had heard from an employee that Loeffler had said, "I'm so fucking tired of working with all these Dan's." (ECF No. 18-19, PageID.1095.) The term "DANs" is short for "Dumb Ass Niggers." (ECF No. 16-11, PageID.471.)

Perkins' complaint prompted an internal investigation. In particular, Kissner Holdings' general counsel retained a law firm (the same one representing Detroit Salt in this litigation) to check into Perkins' allegations. (ECF No. 18-11, PageID.880.) In early April 2019, the investigator from the firm interviewed Manos, Shook, Perkins, Lustila, Loeffler, and others. (ECF No. 18-11, PageID.882.) Following the interviews, the investigator issued a report. (ECF No. 18-11.)

According to that report, the interviewees did not corroborate several of Perkins' complaints. For instance, there were legitimate reasons that the locks on the gates had been changed; and it had only happened one time. (ECF No. 18-11, PageID.881.) Further, according to one employee who was interviewed, "Perkins, Lustila and Loeffler all call each other inappropriate names like 'stupid,' 'b---h'." (ECF

No. 18-11, PageID.885.) The report also stated, "the investigation did not reveal that Perkins's sons were called names or otherwise mistreated because of their race." (ECF No. 18-11, PageID.881.) And according to the report, when Perkins was interviewed, he stated that he had "not heard any racial slurs or been called any racial slurs." (ECF No. 18-11, PageID.882.)

But that is not to say that the internal investigation did not uncover racism at Detroit Salt. Although the employee who had told Perkins about Loeffler's "DANs" remark denied hearing the slur to the investigator (ECF No. 18-11, PageID.885), Loeffler admitted to using the term (ECF No. 18-11, PageID.884). According to the internal-investigation report, "Loeffler has heard many inappropriate comments such as 'n---r' and 'mother----.' He has used the 'N' word while joking with African American workers on the night shift. They also called him the 'N' word or 'Cracker.' It was all in good fun and no one complained about it." (ECF No. 18-11, PageID.883.) The report continues, "Loeffler denied using the 'N' word in an angry tone, but he admitted that in February 2018, he told [another white employee] that he was 'tired of working with these DANs.'" (ECF No. 18-11, PageID.884.) As far as Shook, the report stated, "Shook is aware of racial tension at the Bagging Plant due to the 'chirping' he hears. He described it as grown men worrying about what others are doing rather than focusing on their own tasks. Lustila and Loeffler are on one side and Perkins is on the other." (ECF No. 18-11, PageID.884.) The report also stated, "Caucasian workers were predominantly assigned to work production (inside) while African American workers were predominantly assigned to work in shipping & receiving (outside).

8

Thus, when a port-a-potty was set up outside, there was a perception that it was for the African American workers and that the Caucasian workers were to use the inside bathroom." (ECF No. 18-11, PageID.881.)

The report concluded by stating, "the investigation did not substantiate that Perkins has been unfairly denied a promotion or that there was unlawful motivation regarding the examples of workplace slights that he labeled as harassment." (ECF No. 18-11, PageID.887.) "However," the report continued, "the investigation did substantiate the use of racial slurs by at least one employee who holds a leadership (but not supervisory) role at the Bagging Plant [Loeffler], the rampant use of inappropriate comments and conduct in the workplace that could be perceived as racially-tinged, and division at the Bagging Plant along the lines of race." (ECF No. 18-11, PageID.887.)

Following the internal investigation, Detroit Salt took several remedial actions. For one, Manos, at the urging of Dascher and Kissner Holdings' general counsel, fired Loeffler. (ECF No. 16-4, PageID.272; ECF No. 16-15, PageID.526.) Manos also issued "verbal/informal warnings" to Shook and Lustila. Lustila's disciplinary form stated, "The investigation revealed that you did not report discriminatory comments made by employees to your supervisor or human resources on multiple occasions." (ECF No. 16-15, PageID.525.) Similarly, Shook's disciplinary form stated, "employees you supervise repeatedly told you about inappropriate employee conduct including the potential use of racial slurs that you did not bring to the attention of management and/or human resources." (ECF No. 16-15, PageID.524.)

9

Shook was also disciplined for disclosing "confidential information regarding a possible restructure to" Perkins. (*Id.*) In addition to individually addressing Shook's, Lustila's, and Loeffler's conduct, Detroit Salt also conducted a company-wide training on "Discrimination and Harassment Prevention." (ECF No. 16-18, PageID.535.)

<div align="center">3.</div>

As noted, before Perkins filed his March 2019 complaint with human resources, Dascher and Manos discussed restructuring the bagging plant and having Kissner Packaging take over its operations. (*See* ECF No. 16-4, PageID.259.) According to several witnesses, after Perkins filed his complaint, this restructuring plan was put on hold. (ECF No. 16-13, PageID.517; ECF No. 16-4, PageID.261; ECF No. 18-6, PageID.806.)

But by June 2019 (if not earlier), the process of Kissner Packaging taking over the bagging plant was underway. In June 2019, Shook was moved from Vice President of Operations to Vice President of Distribution; in this new role, Shook no longer had much interaction with the onsite workers at Detroit Salt. (ECF No. 16-3, PageID.209, 240.) And in late summer or early fall, Lustila, the packaging captain, was transferred from the plant back to the mine as an electrician. (ECF No. 16-5, PageID.283; *see also* ECF No. 18-12, PageID.898 (indicating that Lustila's replacement was hired in the fall of 2019).) And although not related to the restructuring, Manos was no longer Detroit Salt's president; he had tragically died in a plane crash on May 12, 2019. (ECF No. 18-22, PageID.1192, 1194.)

And what about Perkins? His employment was formally terminated on May 17, 2019. (ECF No. 16-24, PageID.573.) Perhaps because of Manos' death, not all the details surrounding Perkins' termination are part of the record. (*See* ECF No. 16-4, PageID.263; ECF No. 16-13, PageID.511.) Detroit Salt asserts that "on or before April 19, 2019" (which is the date that Manos disciplined Loeffler, Lustila, and Shook), there was an "initial decision to eliminate [Perkins'] position as part of the restructuring." (ECF No. 18-21, PageID.1184.) Detroit Salt further asserts that Manos, Dascher (Kissner Holdings' COO), and Rod Dohne (Kissner Holdings' Human Resources Director) "were involved in discussions regarding [Perkins'] discharge as part of the restructuring." (ECF No. 18-21, PageID.1184.) After Manos' death, "Dascher proceeded with the decision to discharge [Perkins]." (ECF No. 18-21, PageID.1184.) Perkins' termination letter stated, "due to ongoing restructuring and business reasons, your employment with us will end effective May 17, 2019." (ECF No. 16-24, PageID.573.)

By the fall of 2019, the transition of the bagging plant to Kissner Packaging was complete. Brian DeFreitas, a Kissner employee, became the operations manager of the plant—assuming some of the duties that were formerly Shook's. (*See* ECF No. 16-3, PageID.210; ECF No. 18-12, PageID.894, 898.) But DeFreitas worked from Canada (ECF No. 18-12, PageID.898) and also oversaw another Kissner plant (ECF No. 18-30, PageID.1223; ECF No. 18-9, PageID.872). So DeFreitas hired Marty Mouser as the onsite "production supervisor" of the bagging plant. (*See* ECF No. 16-4, PageID.260; ECF No. 16-5, PageID.296, 301; ECF No. 18-12, PageID.898.) While

Mouser may have initially been hired to perform only Perkins' former duties, within weeks he had taken over Lustila's former duties, too. (ECF No. 16-5, PageID.296, 301; ECF No. 16-4, PageID.267; ECF No. 18-6, PageID.797.) Thus, unlike when Lustila and Perkins ran the bagging operation, there was now a single person in charge of both production and shipping.

## B.

After pursing relief from the Equal Employment Opportunity Commission, Perkins filed this lawsuit. Perkins alleges six violations of law. In Counts I, III, and V, Perkins asserts that Detroit Salt allowed a racially hostile work environment to persist, in violation of Title VII, 42 U.S.C. § 1981, and Michigan's Elliott-Larsen Civil Rights Act, respectively. (ECF No. 1, PageID.16, 19, 23.) In Counts II, IV, and VI, Perkins asserts that after he complained of racism in the workplace, Detroit Salt retaliated in violation of Title VII, § 1981, and ELCRA, respectively. (ECF No. 1, PageID.18, 20, 22.)

Following discovery, Detroit Salt now seeks summary judgment under Federal Rule of Civil Procedure 56. (ECF No. 16.)

## II.

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Or, stated less formally, Detroit Salt is entitled to summary judgment only if no reasonable jury could find in favor of Perkins. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

III.

The Court starts with Perkins' hostile-work-environment claims, and then examines his retaliation claims.

A.

Whether under Title VII, § 1981, or ELCRA, to establish a hostile-work-environment claim, Perkins must show (among other things) that (1) he was subject to unwelcome harassment, (2) the harassment was based on race, (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment, and (4) Detroit Salt knew (or should have known) of the harassment yet failed to take appropriate action. *See Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (Title VII, ELCRA); *Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 442 (6th Cir. 2013) (§ 1981).

Detroit Salt argues that Perkins lacks sufficient evidence of all four of these elements. In particular, the salt company argues that (1) most of the harassment Perkins complains of was not race-based, (2) any race-based harassment was not severe or pervasive, (3) the harassment was not unwelcome, and, failing all those, (4) it properly addressed reports of racist conduct.

Detroit Salt's first two points can be addressed together. In the company's view, Perkins has alleged only two harassing acts that are race-based: Loeffler said "DANs," and Lustila told another white employee that "us white guys have to pick up the slack for the black guys." (ECF No. 16, PageID.148; ECF No. 16-12, PageID.500, 503.) In Detroit Salt's view, "[s]uch allegations cannot establish severe or pervasive

13

conduct." (*Id.*) In support of this argument, Detroit Salt cites a host of cases where courts found, as a matter of law, that the alleged racist conduct was not sufficiently severe or pervasive. (ECF No. 16, PageID.151–153.)

Not all these cases need be discussed; four are representative. In *Williams v. CSX Transport Co.*, the plaintiff overheard her supervisor call Jesse Jackson and Al Sharpton "monkeys," the supervisor also asked the plaintiff why black people could not name their children "stuff that people can pronounce, like John or Sue," and he told the plaintiff that black people should "go back to where [they] came from." 643 F.3d 502, 506, 513 (6th Cir. 2011). In *Nicholson v. City of Clarksville, Tennessee*, the plaintiff, who is African American, heard a co-worker refer to a white employee as a "n[*] lover," heard his supervisor refer to an African-American employee's skin color as "blue," and heard a co-worker use the N-word when singing along to a song that used the N-word; further, both African-American and Caucasian employees used the N-word when trash talking or joking around. 530 F. App'x 434, 437–38, 444 (6th Cir. 2013). In *Nichols v. Michigan City Plant Planning Department*, the plaintiff's co-worker called him the N-word on one occasion (which she claimed was a joke) and engaged in other conduct that could be interpreted as racist. 755 F.3d 594, 601–02 (7th Cir. 2014). In *Al-Kazaz v. Unitherm Food Systems, Inc.*, the plaintiff, who was of Iraqi descent, alleged that over a two-month period, one co-worker referred to him as a "camel jockey," another caller him "sand n[*]," and a third co-worker, on the day Osama Bin Laden was killed, stated, "we should go there and kill all these ragheads."

14

594 F. App'x 460, 461 (10th Cir. 2014). As noted, in each of these cases, the court found, as a matter of law, that the racist conduct was not severe or pervasive.

In this Court's opinion, when viewing the evidence in the light most favorable to Perkins, the environment Perkins faced was more racially hostile than the environments in the above cases.

To start, Loeffler, a self-described "leader" in the bagging plant (ECF No. 18-11, PageID.883), called African-American employees at Detroit Salt "DANs." So in Loeffler's view, his African-American co-workers were "Dumb Ass Niggers." "Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("[The N-word] is perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry."). Indeed, the "[c]ase law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'" *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 454 (6th Cir. 2004); *see also Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 977 F.3d 530, 545 n.9 (6th Cir. 2020). True, Loeffler did not call Perkins, specifically, a "DAN." But Perkins learned that Loeffler had used that racist slur, and, as an African American, Perkins could fairly think that Loeffler thought of him that way. *See Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 442 (6th Cir. 2013) ("In evaluating a hostile work environment claim, the Court . . . consider[s] even those claims that were not directed at a particular plaintiff and those claims that a particular plaintiff did not

witness." (internal quotation marks omitted)); *Johnson*, 117 F. App'x at 456 ("[T]his Court has made clear that a comment need not be 'directed at' a plaintiff, in order to constitute harassment."). Moreover, because Loeffler's responsibility was to bag salt and Perkins' responsibility was to ship the bagged salt, a reasonable jury could find that over the course of a salt season, Perkins was forced to regularly interact with someone who thought of him as a "Dumb Ass Nigger." Indeed, Perkins testified, "[Loeffler] steady harassed me every day." (ECF No. 16-7, PageID.347; *but see* ECF No. 16-3, PageID.218, 234 (indicating that Perkins' team and Lustila's team did not have extensive interaction).)

And apart from Loeffler, a reasonable jury could find that others contributed to making Perkins' work environment racially hostile. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) ("[T]he totality-of-the-circumstances test mandates that district courts consider harassment by all perpetrators combined."). First, Shook remarked that Lustila was "a bigot and a racist." (ECF No. 16-12, PageID.49; ECF No. 16-7, PageID.351; *but see* ECF No. 16-3, PageID.217 ("I recall making some general suppositions [about Lustila] that in hindsight shouldn't have been made.").) And like Loeffler, a reasonable jury could find that Perkins was forced to interact with Lustila somewhat frequently. (*See* ECF No. 16-7, PageID.336 (testifying that working with Lustila and Loeffler was an "everyday struggle").) Second, employees throughout the bagging plant regularly used racial language. As the internal investigator noted, "[Loeffler] used the 'N' word while joking with African American workers on the night shift. They also called him the 'N' word or 'Cracker.'

It was all in good fun and no one complained about it." (ECF No. 18-11, PageID.883.) Lustila recalls that he heard African-American employees use the N-word on, perhaps, an "hourly" basis and believes that the written reprimand he received after the internal investigation was because he did not halt the frequent use of that term. (ECF No. 16-5, PageID.294.) Even Shook, Perkins' direct supervisor, used racist language in a recorded conversation with Perkins: "The Asians or the China, The Chinamen [in the mine] are at the Laotians' throats. . . . The Chinese fucking raped all their women and fucking exported them. . . . And then the Polish, the Polish dudes fucking hate everybody . . . that can't speak Polish." (ECF No. 16-12, PageID.493.) Third, about a month or two before the internal investigation, "a swastika was drawn on a vehicle in the mines and was observed by the African American employees." (ECF No. 18-11, PageID.885–886.) Perkins learned about the swastika, too. (ECF No. 18-14, PageID.988.)

Also consider the findings of the internal investigation. Although the record indicates that most (if not all) of the people that worked for Lustila in the plant were African American (ECF No. 16-5, PageID.285), the internal investigator nonetheless found that "during the most recent salt season, workers appeared to be segregated by race at the Bagging Plant. For example, Caucasian workers were predominantly assigned to work production (inside) while African American workers were predominantly assigned to work in shipping & receiving (outside)," (ECF No. 18-11, PageID.881). "Thus," the report continued, "when a port-a-potty was set up outside,

there was a perception that it was for the African American workers and that the Caucasian workers were to use the inside bathroom." (ECF No. 18-11, PageID.881.)

To sum up, in assessing whether racism in a workplace is severe or pervasive, the Court must consider the totality of the circumstances. Here, even ignoring Perkins' allegations that Detroit Salt says are not credible (more on this later), a reasonable jury could make the following findings: (1) Loeffler stated that African Americans like Perkins were "Dumb Ass Niggers," Loeffler was a leader in the bagging plant, and Perkins had to interact with Loeffler somewhat frequently (and for many months); (2) Lustila also held racial animus, Lustila was a leader in the bagging plant, and Perkins had to interact with Lustila somewhat frequently (and for many months); (3) some employees at Detroit Salt were under the impression that African-American employees were limited to using an outhouse; (4) Perkins was aware that a swastika was drawn on a vehicle in the mine; and (5) there was, as the internal investigator concluded, "rampant use of inappropriate comments and conduct in the workplace that could be perceived as racially-tinged, and division at the Bagging Plant along the lines of race," (ECF No. 18-11, PageID.887). In short, the most offensive language; the most offensive symbol; a perception of segregated bathrooms. A reasonable jury could find that more than "simple teasing, offhand comments, and isolated incidents," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), had occurred in the workplace.

Taking all of this together, this case is different than those where courts found, as matter of law, that racism was not severe or pervasive enough to alter the

plaintiff's working conditions. *Cf. Williams*, 643 F.3d at 513 (no use of the N-word and all but two racist acts occurred during a two-day period); *Nicholson*, 530 F. App'x at 444 (unclear how closely the plaintiff had to work with co-workers who used the N-word and allegations of a workforce segregated by race were not substantiated); *Nichols*, 755 F.3d at 601 (plaintiff only had to tolerate co-worker who used the N-word for two-and-half weeks); *Al-Kazaz*, 594 F. App'x at 461 (co-worker used the term "sand n[*]" but all racist conduct cabined to a two-month period).

Ultimately, whether the alleged racist conduct was severe or pervasive enough to alter Perkins' working conditions is "quintessentially" a question of fact, *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008), and, at least at this point in the litigation, the Court is not prepared to say that, as a matter of law, Perkins' employment was not materially affected by racism.

Apart from the severe-or-pervasive element, Detroit Salt argues that Perkins lacks sufficient evidence of the "unwelcome" element. (ECF No. 16, PageID.150.) In particular, Detroit Salt says that Perkins himself engaged in conduct similar to the conduct he now complains of, and so the alleged harassment was not unwelcome. (*Id.*)

Although a stretch, this argument has some record support. One person interviewed by the internal investigator stated, "Perkins, Lustila and Loeffler all call each other inappropriate names like 'stupid,' 'b---h'. . . . [and] they have said 'f--- off' to each other." (ECF No. 18-11, PageID.885.) And, according to Lustila and Loeffler, African-American workers would use the N-word. (ECF No. 16-5, PageID.294; ECF No. 18-11, PageID.883.) Indeed, during at least one conversation, an African-

19

American employee called Perkins the N-word and Perkins did not object to the use of that word. (ECF No. 16-12, PageID.501.)

But that evidence is insufficient to find as a matter of law that Perkins welcomed the racism he faced in the workplace. It goes without explanation that when an African-American person uses the N-word toward another African-American person, the connotation is entirely different than when a Caucasian person calls an African-American person the N-word. *See Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 977 F.3d 530, 545 n.9 (6th Cir. 2020). There is also a difference between curse words and racial slurs. And while Perkins cursed, he testified that he did not use the N-word. (ECF No. 16-7, PageID.348.) Moreover, the record reflects that well before he learned of any restructuring, Perkins reported Loeffler's use of the N-word or "DANs" to Shook and also reported Loeffler's use of "Toby" to Shook. This does not suggest Perkins welcomed that racist language.

Detroit Salt further argues that Perkins lacks evidence of yet another element of a hostile-work-environment claim. It argues that even if it knew of a racially hostile environment, it cannot be held liable because the record shows that it took prompt, remedial action. (ECF No. 16, PageID.153–154; ECF No. 20, PageID.1231.)

There is some support for Detroit Salt's argument. When Shook learned of Loeffler's use of the N-word or "DANs," he either investigated and could not corroborate the claim (ECF No. 16-3, PageID.220) or "berated" Loeffler and Lustila for Loeffler's use of the slur. (ECF No. 16-5, PageID.287.) Shook also investigated Loeffler's use of "Toby"; he concluded that the manner in which "Tabyis" was written

20

on the sign-in sheet could be read as "Toby." (ECF No. 16-3, PageID.228.) And following his investigations, Shook told Perkins that "if he had any further questions or issues, he could contact corporate HR Jodi Hilton." (ECF No. 16-3, PageID.222.) Further, Lustila recalls that when he heard African-American workers using the N-word, he said, "you guys are going to have to stop using it if you ever want it to stop." (ECF No. 16-5, PageID.290.) And, of course, after Perkins' March 2019 complaint, Detroit Salt launched a full-fledged investigation; that investigation resulted in Loeffler's termination and reprimands for Shook and Lustila. So Detroit Salt is correct that it took some remedial measures in response to allegations of racism.

Even so, a reasonable jury could find that Shook allowed racism at the bagging plant to fester. The record suggests that Shook (if not Lustila, too) was aware of racism in the bagging plant well before Perkins' March 2019 complaint. Loeffler made the "DANs" remark in early 2018—before the second salt season had even started. (ECF No. 18-11, PageID.882, 884, 885; ECF No. 16-5, PageID.287.) And while Shook does not remember anyone reporting that remark to him, a jury could credit Lustila's contrary account that Shook not only knew of the remark but berated him and Loeffler for it. (ECF No. 16-5, PageID.287.) Also before the second salt season, Perkins reported to Shook that Loeffler called Tabyis "Toby," the name of a famous enslaved person. (ECF No. 16-3, PageID.228.) Shook was also aware that some of the forklift operators who worked for Perkins believed they could only use the port-a-potty. (ECF No. 16-3, PageID.231–232.) According to the internal investigator, "Shook is aware of racial tension at the Bagging Plant due to the 'chirping' he hears. He described it as

grown men worrying about what others are doing rather than focusing on their own tasks. Lustila and Loeffler are on one side and Perkins is on the other." (ECF No. 18-11, PageID.884.) So a reasonable jury could find that months before Perkins' March 2019 complaint, Shook knew or should have known of racism at the bagging plant.

Problematically for Detroit Salt, Shook did too little with that knowledge. Shook's characterization of the allegations of racism as "chirping" or "grown men" bickering arguably shows he downplayed the seriousness of the allegations. More significantly though, Shook admitted that he never documented any allegations of racist conduct. (ECF No. 16-3, PageID.222, 230, 232.) And Shook admitted that he never told human resources about any racist conduct. (ECF No. 16-3, PageID.220, 240.) Further, on at least one occasion, Shook stated that Lustila was "a bigot and a racist," yet Shook admitted, "I didn't advertise or share my personal beliefs [about Lustila] with anyone other than [Perkins]." (ECF No. 16-3, PageID.236.) Detroit Salt's employee handbook suggests that HR should be involved in allegations of racism: "Management will work with Corporate Human Resources to thoroughly investigate[]" complaints of discrimination. (ECF No. 18-15, PageID.1015.) And Detroit Salt's corporate counsel testified, "I believe Mr. Shook should have elevated it." (ECF No. 18-6, PageID.814.) Indeed, Detroit Salt's written warning to Shook stated, "employees you supervise repeatedly told you about inappropriate employee conduct including the potential use of racial slurs that you did not bring to the attention of management and/or human resources." (ECF No. 16-15, PageID.524.) Accordingly, a reasonable jury could find that Shook did not take measures

"reasonably calculated to end the harassment." *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 301 (6th Cir. 2021) (providing that a "base level of reasonably appropriate corrective action" might include "reporting the harassment to others in management"). And probably because Shook is a vice president, Detroit Salt does not argue that Shook's failure to act cannot be treated as Detroit Salt's failure to act.

Finally, Detroit Salt argues that Perkins has made a number of allegations of racism during this litigation that he never made to Detroit Salt, to the internal investigator, or to the EEOC. (ECF No. 20, PageID.1229–1230.) For example, during his deposition in this case, Perkins stated that Lustila "[c]all[ed] me . . . n*, saying n* jokes and thinking it's funny. And he had the audacity to ask is it okay if I say a n* joke." (ECF No. 16-7, PageID.348; *see also* ECF No. 16-7, PageID.329.) During his deposition, Perkins also testified that Loeffler directly called him the N-word. (ECF No. 16-7, PageID.329.) Yet these allegations do not appear in Perkins' March 2019 complaint to human resources. (See ECF No. 18-19, PageID.1094–1095.) And after interviewing Perkins, the internal investigator wrote, "[Perkins] has not heard any racial slurs or been called any racial slurs." (ECF No. 18-11, PageID.882.) Citing *Marsh v. Associated Estates Realty Corp.*, Detroit Salt urges this Court to find Perkins' deposition testimony implausible. (ECF No. 20, PageID.1230.) In *Marsh*, the plaintiff testified that she was told that she was "too old for [her] job" when she was terminated; the court found the testimony implausible because the plaintiff never mentioned that ageist remark during the entirety of the EEOC proceedings. *See* No. 10-14120, 2012 WL 12898011, at *6 (E.D. Mich. Apr. 5, 2012).

Even if *Marsh* is on all fours with this case, and even if the Court were persuaded by its reasoning, there is no need to deem Perkins' allegations that Loeffler and Lustila directly called him the N-word implausible. In deciding whether Perkins was subjected to a hostile work environment, the Court has not relied on Perkins' testimony that Loeffler and Lustila called him the N-word. Accordingly, the plausibility of those allegations does not affect the Court's summary-judgment determination.

In sum, Detroit Salt is not entitled to summary judgment on Perkins' hostile-work-environment claims under Title VII, § 1981, and ELCRA.

## B.

The Court thus turns to Perkins' retaliation claims. He claims that Detroit Salt violated Title VII, § 1981, and ELCRA when it terminated him because he complained of racism in the workplace. In his complaint, Perkins lists additional retaliatory acts (*see* ECF No. 1, PageID.18), but in his summary-judgment response brief, Perkins focuses solely on his termination (*see* ECF No. 18, PageID.714). As such, the Court treats Perkins' retaliation claims as limited to his discharge.

The framework for analyzing retaliation claims depends on whether there is direct or indirect evidence of retaliation. Here, "[Perkins] [has] not present[ed] any direct evidence of retaliation, such as an explicit statement from [Detroit Salt] that it was firing him in response to his discrimination claims." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). And when there is only circumstantial evidence of retaliation, courts use the *McDonnell Douglas* framework to analyze

retaliation claims under Title VII, § 1981, and ELCRA. *See Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021) (Title VII and ELCRA); *B & S Transp., Inc. v. Bridgestone Americas Tire Operations, LLC*, 758 F. App'x 503, 505 (6th Cir. 2019) (§ 1981).

Under the *McDonnell Douglas* framework, Perkins has the initial burden of demonstrating a prima facie case of retaliation. *See Jackson*, 999 F.3d at 344. If he succeeds, then Detroit Salt has the burden of producing evidence that it terminated Perkins for a non-retaliatory reason. *Id.* If Detroit Salt succeeds, then Perkins can attempt to show that Detroit Salt's reason is merely pretext for retaliation; but the typical ways of showing pretext are "simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

1.

To establish a prima facie case of retaliation, Perkins must establish four elements, including causation. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343–44 (6th Cir. 2021). But Detroit Salt does not expressly apply the *McDonnell Douglas* framework and focuses solely on causation. (*See* ECF No. 16, PageID.154– 156.) So, at the prima facie stage, the Court need only decide whether Perkins has shown that "there was a causal connection between the protected activity and the adverse employment action." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 488–89 (6th Cir. 2020).

Temporal proximity satisfies Perkins' burden at the prima facie stage. Perkins' protected activity—a complaint of racial discrimination to Kissner Holdings' human resources—was sent on March 26, 2019. (ECF No. 18-21, PageID.1166.) As for the adverse action, Detroit Salt says its "initial decision" to eliminate Perkins' position was made "on or before April 19, 2019." (ECF No. 18-21, PageID.1184.) So the time between the two was short: less than a month. That short gap between protected conduct and adverse action is sufficient to establish causation at the prima facie stage. *See George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (indicating that an adverse action mere "weeks" after the protected activity is evidence of retaliation); *see also Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 421 (6th Cir. 2021); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).

In resisting that result, Detroit Salt argues that it had planned to restructure the bagging plant, and thus terminate Perkins, before Perkins' protected conduct on March 26. (ECF No. 16, PageID.156.) And, says Detroit Salt, while that plan was put on hold during the internal investigation, once that investigation was complete, it simply proceeded along lines previously drawn: it transferred the bagging plant to Kissner Packaging, and none of Shook, Lustila, or Perkins continued to be involved with the plant. (*See* ECF No. 20, PageID.1233.)

There is some evidence backing Detroit Salt's argument. In or around February 2019, before Perkins filed his complaint, Dascher (Kissner Holdings' COO) had expressed to Manos that he was dissatisfied with how the bagging plant was being run and that Manos should "consider making some changes." (ECF No. 16-4,

PageID.259.) Dascher further recalls that the options were "changing management or potentially, you know, turning the business over to . . . Kissner Packaging." (ECF No. 16-4, PageID.259.) And Dascher's testimony tracks with other evidence. Before Perkins' complaint, Shook had learned from Manos that Lustila might be taking over both the production side and shipping side of the bagging plant. (ECF No. 16-3, PageID.235; ECF No. 16-12, PageID.508; *see also* ECF No. 18-11, PageID.880 (indicating that Manos had "questioned why Lustila was not in charge [of the plant]").) Indeed, Perkins' concern over Lustila leading all plant operations is what prompted him to file the March 26 complaint. (ECF No. 18-14, PageID.984.)

The problem for Detroit Salt, though, is that a reasonable jury could find that before Perkins' complaint, the restructuring plans were entirely fluid. Dascher could not recall when the plans crystalized. (ECF No. 16-4, PageID.259.) Neither could Detroit Salt's corporate counsel. (*See* ECF No. 18-6, PageID.814.) No one deposed DeFrietas—the Kissner employee who ended up overseeing the plant. As for Manos, the evidence suggests that prior to Perkins' March 26, 2019 complaint, he had made no decisions about how the bagging plant would be staffed in the future. On April 5, 2019, Manos was interviewed by the internal investigator; and according to the investigator's report, "Manos and Shook discussed restructuring the Bagging Plant's operations . . . . No decisions have been made with respect to which employee would take on what responsibilities." (ECF No. 18-11, PageID.880.) The investigator also wrote, "As for restructuring, no plans have been made." (ECF No. 18-11, PageID.886.) Thus, it is a fair inference that as of April 5, 2019—which is after Perkins' complaint

of race discrimination—the restructuring plans were still entirely fluid and, as of that time, it was still undecided whether Perkins would continue to work at the bagging plant (or, at least, at Detroit Salt).

That fact distinguishes this case from the one cited by Detroit Salt. (ECF No. 16, PageID.156.) In *Reynolds v. Federal Express Corp.*, the Sixth Circuit, echoing the Supreme Court, stated, "Employers 'proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" *Id.* at 615 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). But in *Reynolds*, the employer's plan to take the adverse action was more concrete than Detroit Salt's. In particular, before the employee's protected conduct, her supervisor had decided on a performance improvement plan and had largely drafted the plan. 257 F. App'x at 916, 920. So the employee's supervisor was not merely thinking about a performance improvement plan before the protected conduct but had decided to issue one and had taken steps to implement it. But here, a reasonable jury could find that when Perkins filed his complaint of racism, Dascher's and Mano's restructuring plans were not nearly so firm.

<div align="center">2.</div>

So the analysis proceeds to step two of the burden-shifting framework: has Detroit Salt carried its burden of producing evidence of a non-retaliatory reason for Perkins' termination?

The Court thinks so. There is no dispute that a restructuring took place. By June 2019 (if not earlier), Shook was no longer involved in bagging plant operations—

<div align="center">28</div>

that responsibility had largely gone to DeFrietas, a Kissner employee. And in the fall of 2019, DeFreitas hired Mouser; Mouser ended up performing both Lustila's and Perkins' duties. Thus, by September 2019, none of the Detroit Salt employees who had overseen the bagging plant during the prior season (Shook, Perkins, Lustila, and Loeffler) were involved with the bagging plant. Accordingly, Detroit Salt has carried its burden at step two.

<div align="center">3.</div>

At step three of the *McDonnell Douglas* framework, Perkins must show that a reasonable jury could find that but-for his complaint of discrimination, he would have kept his job. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). One way for Perkins is to do this is to produce evidence that the restructuring was merely a pretext for retaliation. *See id.*

While close, the Court believes that a reasonable jury could find that Perkins was terminated because he complained of racism in the workplace.

To start, there was little time between Perkins' protected conduct and Detroit Salt's "initial decision" to terminate Perkins' employment. And while temporal proximity cannot establish pretext on its own, "it can be a strong indicator of pretext when accompanied by some other, independent evidence." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 516 (6th Cir. 2021) (internal quotation marks omitted).

And here, there is "some other, independent evidence."

For one, Perkins' complaint led to Loeffler's termination, and it would not be unreasonable for a jury to think that Manos, one of the people involved in the decision

<div align="center">29</div>

to terminate Perkins, was not pleased about terminating Loeffler. Loeffler had worked at Detroit Salt for many years (ECF No. 18-6, PageID.815), and Loeffler lived in Manos' general neighborhood (even possibly across the street) (ECF No. 16-5, PageID.293; ECF No. 16-3, PageID.223). A jury could also find that it was not Manos' decision to fire Loeffler, but essentially an order from above. (ECF No. 16-4, PageID.272.) And Dascher further indicated that Manos was not happy to see Loeffler go: "[The general counsel] and I talked to [Manos] and told him what we wanted to do [with Loeffler], and EZ . . . felt bad for [Loeffler], didn't want to see anybody lose . . . a job, but, you know, [he] understood that it had to happen." (ECF No. 16-4, PageID.272.)

For two, fully accepting that the bagging plant underwent a restructuring, it is not at all clear from the record why Perkins was not even considered for Mouser's position. One possibility is Detroit Salt's policy of not rehiring employees who were terminated with additional pay; but, as discussed below, a jury could question the legitimacy of that policy. DeFrietas might know why Perkins was not considered for Mouser's position; after all, it appears that DeFreitas hired Mouser. But no one deposed DeFreitas. Of those who were deposed, several were asked whether Perkins would have been qualified for Mouser's position. But none could answer one way or the other. (*See* ECF No. 18-12, PageID.900 (Dhone, HR Director); ECF No. 16-4, PageID.267 (Dascher, Kissner Holdings COO); ECF No. 18-6, PageID.797 (Fishman, Detroit Salt Corporate Counsel).) While Mouser handled both sides of the operation (production and shipping), and Perkins only ever handled shipping, Lustila testified

that when Mouser first started, "[h]e primar[il]y just did the yard and shipping. . . . [H]e didn't have a very good grasp on production." (ECF No. 16-5, PageID.296.) So it is not obvious that Perkins was unqualified for Mouser's position.

For three, a reasonable jury could infer a retaliatory motive from the fact that Detroit Salt not only terminated Perkins, but covertly ensured that he could not be rehired. The record indicates that in early May 2019, Perkins and Detroit Salt were negotiating a severance in exchange for Perkins releasing his claims against the company. (ECF No. 18-12, PageID.903.) Although the two sides did not reach an agreement, Detroit Salt decided to give Perkins two weeks of additional pay anyway. This rendered Perkins ineligible for rehire. (ECF No. 18-12, PageID.895–896; ECF No. 18-24, PageID.1202.) While additional pay sounds like a non-retaliatory reason to prohibit rehire, Kissner Holdings' human resource director stated that this policy was not written down anywhere and that employees were not informed of this policy. (ECF No. 18-12, PageID.889, 900.) At a minimum, it is a fair inference that Perkins was never informed of the policy. Perkins' termination paperwork states he would receive two weeks' additional pay but does not state that the pay would bar him from being rehired. (ECF No. 16-24, PageID.573.) And Perkins has applied to be rehired at Detroit Salt, further supporting the notion that he was unaware of the policy. (ECF No. 18-12, PageID.895–896.) Detroit Salt did not interview Perkins because of the no-rehire policy—but Detroit Salt points to no evidence that this was ever communicated to Perkins.

In sum, a reasonable jury could find, based on several factors, that had Perkins not complained of racism in the workplace, he would have maintained a job at Detroit Salt: (1) Detroit Salt decided to terminate Perkins less than a month after he complained of racism in the workplace; (2) Perkins' complaint led to Loeffler's termination—something that, arguably at least, Manos was not happy about; (3) there is little evidence as to why Perkins was not considered for Mouser's position; and (4) Detroit Salt not only terminated Perkins, but precluded his rehire based on unwritten, undisclosed "policy."

Accordingly, Detroit Salt is not entitled to summary judgment on Perkins' retaliation claims under Title VII, § 1981 and ELCRA.

## C.

Apart from liability, Detroit Salt also seeks partial summary judgment on the issue of damages. Detroit Salt argues that after September 2019, Perkins stopped applying for jobs so his claim for backpay should be limited for that reason. (ECF No. 16, PageID.157–158.) Additionally, says Detroit Salt, in September 2020 it received documents showing that Perkins made misrepresentations about his work experience when he applied to work for Detroit Salt. (*See* ECF No. 16, PageID.158–159.) Invoking the "after acquired evidence doctrine," Detroit Salt says that Perkins' "economic damages should be precluded after September 23, 2020." (*Id.* at PageID.159.)

As neither of these arguments affect whether Perkins can present his case to a jury, they can be addressed at a later time. Further, more complete briefing would

help. Detroit Salt's damages arguments are covered in a mere two-and-half pages, and Perkins' response is about a page. Detroit Salt may file a motion in limine on the issue of damages at a later date.

<div align="center">IV.</div>

For the reasons given, Detroit Salt's motion for summary judgment (ECF No. 16) is DENIED. Further, because Exhibit 28 to Detroit Salt's motion does not alter this Court's summary-judgment ruling, the Court DENIES Perkins' motion to strike that exhibit (ECF No. 21).

SO ORDERED.

Dated: December 17, 2021

<div style="margin-left: 40%;">

s/Laurie J. Michelson     
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

</div>